UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DE'BORAH BYRD, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-04885 |
| | § | |
| DEVOTED HEALTH SERVICES, INC., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Pending before this Court is Defendant Devoted Health Services, Inc.'s ("Defendant" or "Devoted Health") Motion for Summary Judgment (Doc. No. 12). Plaintiff De'borah Byrd ("Plaintiff" or "Byrd") filed a response, (Doc. No. 14), and Devoted Health replied. (Doc. No. 15). After a close review of the filings, admissible summary judgment evidence, and the relevant legal standards, this Court hereby **GRANTS** Devoted Health's Motion for Summary Judgment (Doc. No. 12) and **DISMISSES** this case with prejudice.

### I.    Factual Background

This case arises from alleged employment discrimination and retaliation. In September 2022, Byrd, a "Black and Nigerian" woman, (Doc. No. 14 at 8), began working at Devoted Health. Devoted Health is a health insurance company specializing in Medicare Advantage plans for seniors, as a remote Member Outreach Specialist. (Doc. No. 12-2 at 5, 13); (Doc. No. 14-1 at 1). As a remote Member Outreach Specialist, Byrd worked from home and was responsible for making calls to Devoted Health members to assist them with scheduling appointments and

enrolling in clinical programs. (*Id.* at 6–7). Byrd was responsible for completing 50 calls per day to Devoted Health members. (*Id.* at 8).

In March 2023, Byrd received her 2022 Annual Performance Review. (Doc. No. 14-1). The Review stated, in part:

> De'borah has met/sometimes exceeded in her call/appt goals, quality goals, and competencies. She asks great questions in order to better understand processes and offers advice to her fellow teammates when she has encountered a situation that may be beneficial for them to be able to navigate in the future.

(*Id.* at 1). Based on the record before this Court, Byrd did not receive any formal or informal disciplinary actions, warnings, or notices in 2022 or 2023.

After over a year of employment with Devoted Health, Byrd took an approved leave of absence from her position at Devoted Health under the Family and Medical Leave Act ("FMLA") due to abdominal surgery. (Doc. No. 12-2 at 9); (Doc. No. 14-2 at 23). Byrd was on leave from December 20, 2023 through February 5, 2024. (Doc. No. 12-2 at 9). At the conclusion of her leave of absence, Byrd was approved by her physician to return to her full duty at Devoted Health without any restrictions or modifications. (Doc. No. 12-3).

Upon her return to Devoted Health, Byrd remained in her role as a Member Outreach Specialist, but she was assigned to a new team. (Doc. No. 12-2 at 9). Byrd switched from scheduling appointments with nurse practitioners to a team that specialized in scheduling appointments with technicians. (*Id.* at 10). Before she began work with the new team, Byrd received a two-day training for the new software program that the team used to place calls and schedule appointments. (*Id.* at 11). Byrd then began to work for the new team under a different manager, Tiffany Pierce ("Pierce"), "a Black, African American woman." (*Id.* at 12); (Doc. No. 12 at 8).

Pierce scheduled one-on-one meetings with Byrd to address her work on the new team. On February 15, 2024, Pierce met with Byrd "to go over drive time expectations as she reached out for assistance" to improve her scheduling process.[1] (Doc. No. 12-2 at 14–15); (Doc. No. 12-4 at 20). On February 23, 2024, however, Byrd was "flagged" for "scheduling drive time errors" even after the training call. (*Id.*). As a result, a senior member on the team attempted to meet with Byrd and, in an attempt to correct the mistakes, Pierce "provided [Byrd] with a list of members to reschedule – and provided a [one] hour block to complete the tasks." (*Id.*). Pierce noted that Byrd never rescheduled those members and failed to complete the assignment. (*Id.*). Byrd, however, testified in her deposition that when she went to view the list, "the team lead had already rescheduled all the appointments." (Doc. No. 12-2 at 20).

On February 27, 2024, Pierce and Byrd had a scheduled shadowing session, but Byrd had twice attempted to reschedule through the shared calendar. (Doc. No. 12-4 at 16). Internal messages between Pierce and Byrd show the following exchange:

> PIERCE at 8:49AM: Good Morning [De'borah] – we are shadowing today. Please prepare and I will see you at 9am – thank you.
>
> BYRD at 8:51AM: Good morning, I changed the time 2x, because I will not be available at 9.
>
> PIERCE at 8:51 AM: Can you explain why you won't be available? Are you clocking out for the day? I am not seeing a request for PTO? [] If you are needing to take time – please let me know. I see that you are clocked as of 825am and have made 0 calls since your start time? [] I am in the meets – please join unless you are needing to clock out for the duration of this shadowing session. Thank you.

---

[1] In support of its Motion for Summary Judgment, Devoted Health relies on a document titled "Deborah Data" that was purportedly prepared by Tiffany Pierce. (Doc. No. 12-4). The document describes meetings, messages, and other interactions between Pierce and Byrd. The document also contains screenshots of internal messages. Byrd did not object to this evidence and refers to the same document in her Response. (Doc. No. 14-1 at 11). Accordingly, the Court may rely on the document. *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (explaining that "materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence").

3

> PIERCE at 9:10AM: Anything longer than 5 minutes of personal time requires you to be clocked – I am assuming that since we dropped from the meeting at [9]02 am and have not returned as of [9]09 [] you are planning to submit a form for clock out for personal time.

(*Id.* at 17). According to Pierce, Byrd joined the meeting at 9:15AM and stated that she attempted to reschedule because she knew that she needed to be in the bathroom. (*Id.* at 18). Pierce informed Byrd she needed to contact Human Resources to seek an accommodation if she needed to use personal time to frequently use the bathroom. (*Id.*). During her deposition, Byrd testified that she attempted to cancel the meeting "because [she] kept having panic attacks and anxiety attacks" and that her repeated messages "back to back, back to back, back to back . . . caus[ed] [her] to have – was making [her] – have the episode even worse. And that's when [she] finally joined the call." (Doc. No. 12-2 at 21). Byrd testified that she "was telling [Pierce] about that she was making [her] feel uncomfortable" and that "she was being unprofessional." (*Id.*). Byrd said that Pierce accused her of "stealing time," and Byrd further testified:

> I wasn't stealing time. And I said I just got back from surgery and my sister just passed away. So I'm just trying to get myself together. And I said you're making me feel uncomfortable by repeatedly texting me back to back to join the call when I – when I asked to reschedule because I'm not in a good head space.
>
> And then she just kept on – it's like she was getting off on it or something. She started looking demonic in the face and kept saying the same thing: you're stealing time, you're stealing time.
>
> And like, I don't know, but she just – I can't remember what happened after that. Then she said she's going to disconnect the call and then [] reschedule the meeting.

(*Id.* at 23).

After this interaction, Pierce and Byrd both reached out to Human Resources. *See* (Doc. No. 12-5 at 2); (Doc. No. 12-6). Byrd emailed two Human Resources employees:

> Tiffany [Pierce] added shadowing on my calendar, and I changed the time to the afternoon. She then slack [*sic*] me asking why I changed it. I responded, letting her

know that I would not be available at that time. I left the bathroom at 9:02am; I joined the meeting and immediately told her I had to go to the bathroom. Once I joined the meeting, she began to say I was stealing time because I was not making any calls in the morning. She then stated, she notices in the morning I am not calling anyone. I explained to her I just got back from surgery; in the morning I have to go to the bathroom multiples [*sic*] times. I then express to her, that forcing me to interact with her makes me feel uncomfortable and I did not feel comfortable telling her, that I have to go to the bathroom more often than normal since I had surgery and just returned back to work from leave. She smirked as if it was funny, and then asked if I had spoken with benefits. She then stated I was stealing time and wasn't making any calls and I need to clock out if I have to go to the bathroom. I asked her how I can make calls if I am in the bathroom. She then stated I need to go ahead and clock out for the day, if I am not going to be making any calls. I then said, I can start making calls now, that is why I joined the call. She said, what do you mean? She mentioned again I was stealing time, and said she will follow up with HR, and I told her let me know what HR says.

This is the second time she has tried to force me to speak with her, after I suggested meeting with her at a different time. Another reason, I did not feel comfortable telling her anything personal about me, because when I told her last week that my sister in law was dying of cancer she had this smirk on her face the entire time. If she laughed about my sister dying of cancer, I knew she would laugh about something even more personal going on with my health.

I expressed to her again, the forced interactions make me feel extremely uncomfortable. She said she will cancel shadowing and the 1:1 for the day and would get back to me once she spoke to HR.

(Doc. No. 12-6). Later that day, Human Resources responded to the email:

Thank you for reaching out with this information. In your email you state that in the morning you have to use the bathroom multiple times. If more bathroom breaks are needed outside of the already provided 2-15 minute breaks per day, this would be considered an accommodation and does need to go through an approval process. You will need to submit a claim with SunLife for a medical accommodation and it will need to go through SunLife's review process; similar to what happened with your recent leave of absence. Without an approved accommodation you are expected to adhere to your schedule and be working during your scheduled shift. Please let me know if you have any questions.

(*Id.*).

On the same day, Pierce met with Human Resources and reviewed Byrd's "productivity" from February 12th through February 27th. (Doc. No. 12-4 at 18–20). Pierce reviewed the time

that Byrd clocked into work and the time she made her first call to a member. (*Id.*). For example, Pierce noted that on February 16th, Byrd clocked in at 8:26 AM and did not make her first call until 9:26 AM, for a total "no outreach" time of 50 minutes.[2] Pierce concluded that, in that two-week time frame, Byrd was unaccounted for and not making calls to members for a total of 8.5 hours. (*Id.*).

Two days later, on February 29, 2026, Devoted Health issued a "Performance Final Warning" to Byrd. (Doc. No. 12-7). The Final Warning lists "[f]ailure to complete assigned tasks," "Call Avoidance Behavior," "Failure to Demonstrate Accountability and Ownership," "Failure to Demonstrate Organizational Skills," and "Misrepresentation of Working Hours" as the reasons for the warning. (*Id.*). Devoted Health provided specific examples to support each of these reasons. For the "Failure To Complete Assigned Tasks, Demonstrate Accountability and Ownership and Demonstrate Organizational Skills," Devoted Health stated:

> Supervisor and De'borah met to review drive time expectations as she reached out for assistance. De'borah was told that we must include a lunch block for techs and that we are not able to utilize the tech's lunch block for drive time. Talked through drive time guidelines. [Byrd] stated she understood. However, error still occurred and on 2/23 supervisor met with De'borah and provided her with a list of members to reschedule – and provided a 1 hour block to complete the tasks. As of 2/27/24 members on the list were not outreached or rescheduled.
>
> [Byrd] did show appropriate follow through skills related to [Member Outreach Specialist] role and expectations.
>
> [Byrd] has failed to be open to constructive feedback from Seniors/Supervisors. Refused to meet with senior to review drive time errors made.

(*Id.*). For "Call Avoidance Behavior," Devoted Health stated that on February 21, 2024, the Supervisor reviewed Call Avoidance expectations, including avoiding "Excessive Gaps between

---

[2] This result was reached by taking the total "no outreach" time and subtracting the allotted ten minutes of personal time each morning. (*Id.*).

calls," "Toggling between Talkdesk Statuses," and "Failure to outreach to members once clocked in for the business day." (*Id.*). Devoted Health did not provide or reference any specific actions attributed to Byrd under this category. Under "Misrepresentation of Working Hours," Devoted Health stated:

> Supervisor had scheduled a shadowing session prior to scheduled 1:1 with [Byrd]. [Byrd] responded to supervisor that she rescheduled meets due to not being available during that time. Supervisor explained the shadowing session was still on as scheduled as [Byrd] has no other meeting during that time and was not scheduled to be off. [Byrd] joined the meets late at 9:15 and the supervisor explained that being clocked in but not completing work is considered time theft and she would review with HR and leadership. From 2/12/24 to 2/27/24 – [Byrd] has utilized 8 hours and 30 minutes not reached out to members at the start of her shift.

(*Id.*).

The Final Warning stated that "[a] disciplinary action for conduct remains in effect for 6 months . . . Should the employee exhibit any behavior (related to this issue or not) requiring a written warning within the next 6 [m]onths, further disciplinary action including termination may be considered." (*Id.*). Devoted Health also provided a "Manager Evaluation" that included specific action items for Byrd, including:

- De'borah will immediately refrain from misrepresenting hours worked including but not limited to beginning outreach at the beginning of shift/clock in time, toggling between talk desk statuses, excessive extended call gaps between calls, and not exceeding lunches or breaks or other related actions that delay outreach.

- De'borah should immediately begin to inform her supervisor or covering supervisor if she needs to step away from her desk for any time outside of her breaks, or lunches or if the need for personal time exceeds 5 minutes per day and does not exceed personal time usage more than 2 times per day. If [she] needs to utilize more than 5 minutes of personal time [she] should clock out and/or return to outreach immediately after 5 minutes has passed. If unable to clock out [she] should fill out the missed punch form for the time card to be adjusted with accurate hours worked.

- De'borah will immediately begin to complete tasks/assignments assigned to her by the leadership team.

- [Byrd] should be open to feedback and coaching from members of the Leadership team, including Managers, Supervisors, and Seniors.

(*Id.*).

On the same day that Byrd received this Final Warning, February 29, 2024, Byrd submitted her accommodation request through the third-party provider, SunLife, as directed by Human Resources. (Doc. No. 14-2 at 38–43). Byrd requested an accommodation for her frequent trips to the restroom. Byrd stated:

> I am able to perform my job functions. This accommodation will help me, [i]f I need to go to the bathroom at random, I do not want to be harassed at work, by my supervisor repeatedly slacking me; telling me that I am taking to [*sic*] long a way [*sic*] from my work station.

(*Id.* at 39). Byrd also stated that "I have informed my supervisor, and she accused me of stealing time; since I have to use the bathroom longer than 5 min and said that was personal time." (*Id.*).

While the accommodation request remained pending, Pierce noted that Byrd continued to make mistakes after she received the Final Warning. On February 29, 2024, Pierce noted that Byrd "did not complete confirmation calls" for the appointments despite several reminders to do so. (Doc. No. 12-4 at 15). On March 5, 2024, Pierce described that Byrd was unable to log into her computer that morning:

> [Byrd] sent a message that she was unable to log into her computer. Provided [Byrd] with a number to Corp IT. Update: 3/7/24 [Byrd] has not submitted [IT] ticket. [Byrd] was clocked in at 8:25 am in workday and clocked out at 830 am on this day. [Byrd] did not clock back in until 901 am. [Byrd] did submit the [m]issed time punch form – but unsure why she clocked out of the system and signed out of her laptop after clocking in. Did not clock back in until 9:01 am – There is concern about why [Byrd] was clocked in but not logged into her laptop? [Byrd] did not make the first call on this day until 930am. Even though her tech issues were resolved by 835am - [Byrd] reach out 25 minutes later stating that her Looker was not loading. To which I respond and asked [Byrd] to clear cache and cookies as well as work to get connected to ethernet as previous screen shot of laptop did not reflect [Byrd] was connected to ethernet. It does not take [the system] 30 minutes to boot. [Byrd] is still displaying call avoidance behaviors one week after delivery of Warning.

8

(*Id.* at 12).

Pierce continued to document her issues with Byrd. Pierce noted that she was working in the incorrect status on the internal management system and editing a template instead of her own document. (*Id.* at 10–11). On March 6, 2024, Pierce sent a calendar invitation for another shadowing session, and Byrd declined the meeting invitation. (*Id.* a 9). Pierce sent the following message to Byrd:



**Tiffany Pierce** 4:11 PM

Hi @De'borah - Wanted circle back on a few reminders:

- When confirming appointments we should be making 2 call attempts to members - once in the morning and once in the afternoon -and sending 1 SMS after the first attempt if you are unable to connect with member on the first call. This is outlined in the IHT Outreach Workflow Guide shared with you 2/21 and on 2/29.
- When calling members - we should follow QA guidelines and verify the member's identity prior to releasing PHI.
- If a member profile reflects that they speak Spanish - the steps should be that you reach out in the 🔒iht-mos-texas-pod and tag your peers who speak Spanish to ask that they please confirm the Spanish speaking members on your assigned tech's schedule. This is to ensure that members have the best experience when speaking with Devoted.
  - I reviewed a few confirmations calls where we are releasing PHI without verifying Identity and/or speaking to members who would benefit from having someone who speaks Spanish complete their confirmation call for the best member experience and tech's safety.
- During the confirmation call we are confirming that the date and time still works for the members, but we are also to confirm that the member is healthy at the time of the visit for our tech's safety. Please be sure to ask the MOS COVID Protocol for In-Home Technician (IHT) Appointments - shared previously on 2/21 and on 2/29.
- Please be sure to post in the pod count thread located in the 🔒iht-mos-texas-pod - that you have completed confirmations for your tech for the next day.
- If you haven't already - please submit the IT ticket before the end of the day today. If you have't already submitted please add me to the ticket for yesterday's clock-in tech issue.
- We have a shadowing session scheduled for Friday, March 8th at 9 am. Please accept the invite. During the session the ask is that you share your screen and outreach members. During this time you are able to mute the meeting as well as turn off your camera as I find this to be more comfortable for MOS. Once we have completed shadowing we will meet at 930 am and I will provide feedback from the shadowing and answer any questions that you may have. An email recap will be sent to summarize our shadowing session, topics/tips and tricks covered that may be helpful.

Please let me know if you have any questions. Thanks so much

(*Id.*). Pierce noted that Byrd continued to demonstrate deficiencies with her work. Pierce described that Byrd failed to follow to protocol to contact Spanish-speaking members, failed to ask "Covid Protocol questions," and failed to confirm identify before releasing private health information. (*Id.* at 8). Pierce also documented that Byrd declined to accept the invitation to an "All Hands Meeting" after multiple reminders. (*Id.*).

Pierce also listened to several calls that Byrd made to members. Pierce made several observations, including:

- "After spending 22 mins on a previous call with the member – [Byrd] left a v-mail letting the member know the day and time did not work and she was canceling."

- "From the 53 second mark to the 2 min 09 [Byrd] sat in silence identifying a space to schedule members in. Another call that does not align with [Byrd] searching for a space to schedule members prior to calling."

- "[Byrd] does not demonstrate the ability to use appropriate tone when speaking with members."

- Byrd "sat on voicemail 1 min and 20+ secs and did not say anything."

(*Id.* at 5–6). Devoted Health provided a audio recording of one of these phone calls in support of its Motion for Summary Judgment. (Doc. No. 12-8). On the phone call, Byrd spent nearly seven minutes attempting to schedule an appointment for the member. (*Id.* at 6:27). Just as the appointment was to be confirmed, a cell phone rings in the background and Byrd stated, "hold on one second, hold on one second" and places the member on hold. (*Id.*). After waiting nearly fifteen minutes on hold, the member ended the call. (*Id.* at 21:02).

On March 8, 2026, Byrd attended the shadowing session with Pierce. (Doc. No. 12-4 at 3). Pierce described the session:

> Sent email recap to [Byrd] with Tips and best next steps moving forward. Called 8 members without looking to see where they could fit prior to calling. [Byrd] spent time switching from screen to screen – without making an actual outreach on multiple occasions. However, [Byrd] made 8 outreaches in a 30 minute time frame she worked very efficiently through outreaches without long delays or long call gaps in between members. . . . [Byrd] reached out for the first time today to request someone reach out to the Spanish speaking members on her list.

(*Id.*).

During the time period that Pierce was monitoring Byrd's work, Byrd received her 2023 Annual Performance Review. (Doc. No. 14-1 at 5). Byrd was reviewed for the time period from January 1, 2023 through December 31, 2023 by her previous Manager, Eric Lowery. The Review stated:

10

De'borah has met and sometimes exceeded her performance standards during the course of the year. . . . De'borah excelled in listening to members and asking questions to better ascertain the support the [] visit could provide to those members. Her ability to simplify complex problems led to her being highly successful in assisting members with high level outcomes. De'borah often used tools and resources provided to her before reaching out but did not shy away from getting support when needed. . . . She is quick to adapt to work flow changes and takes great care to ensure that she is completing needs for members correctly. She often uses her prior experience to guide her actions and assist members although it has led to some occurrences of workflow corrections among other teams. She remains accurate with documentation as well as thorough. De'borah maintained a year of positive attendance although we did note some discussions regarding late to ready at the end of the year. De'borah supported a growth mentality throughout the year which allowed her to quickly adapt and provide feedback leading to many improvements within the [] teams.

De'borah is often seen as a hard worker on her team. She often offers guidance to other[s] [] in an attempt to support them and help them grow. De'borah does not shy away from accepting responsibility for mistakes and attempts to correct them quickly after understanding how it occurred and what she should do differently next time. De'borah is very member focused and often provides support above her required duties to ensure that members she is in contact with feel that Devoted is treating them like family.

(*Id.*).

On March 8, 2024, SunLife sent a letter to Byrd's home in response to her accommodation request for frequent trips to the restroom. (Doc. No. 12-8). The letter requested more information about her health condition and set out certain steps for her to take by April 2, 2024, to complete the process. (*Id.*). The letter also stated that "Devoted is committed to engaging in an interactive process with you about your accommodation requests and providing reasonable accommodations in compliance with the ADA and other laws." (Doc. No. 12-9 at 12).

Nevertheless, on March 11, 2024, Devoted Health terminated Byrd's employment. (Doc. No. 14-2 at 59); (Doc. No. 12-10 at 2). Katherine Newton, a Senior Director for the Human Resources Department, provided a sworn declaration that stated:

Ms. Pierce made the decision to terminate Ms. Byrd's employment, with the approval of her manager Gabby Dominguez and Human Resources. Ms. Byrd's

11

employment was terminated because of her uncorrected poor performance, including engaging in call avoidance behavior, failure to complete assigned tasks, and because she placed a member on hold and misrepresented to the member that she could not hear her (all while on a final warning). No protected category or activity, including any request for leave or accommodation, was taken into consideration in making any decision as to Ms. Byrd's employment. Ms. Byrd's employment would have been terminated no matter any protected activity or category.

(*Id.*). On the following day, Byrd filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission. (Doc. No. 12-11). Devoted Health received a Notice of Charge of Discrimination on March 21, 2024. (Doc. No. 12-12).

On September 18, 2024, the U.S. Equal Employment Opportunity Commission ("EEOC") issued the Determination and Notice of Rights to Byrd and notified her of her right to sue. (Doc. No. 14-2 at 65). On December 13, 2024, Byrd filed the case against Devoted Health in this Court. (Doc. No. 1). Byrd sued Devoted Health for discrimination and retaliation on the bases of race, nationality, and disability under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act. (*Id.*). Byrd also sued Devoted Health for a hostile work environment and the intentional infliction of emotional distress. (*Id.*). Devoted Health requests the Court to dismiss each of these claims at the summary judgment stage of this litigation. The Court addresses the Motion for Summary Judgment (Doc. No. 12) below.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show

12

that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### III.    Analysis

Byrd brought discrimination claims on the bases of race, nationality, and disability under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"). (*Id.*). Byrd also sued Devoted Health for a hostile work environment and the intentional infliction of emotional distress. (*Id.*). The Court addresses each of the claims below and hereby **GRANTS** Devoted Health's Motion for Summary Judgment (Doc. No. 12) and dismisses this case with prejudice.

#### A.  Race and National Origin Discrimination

Byrd, a "Black and Nigerian" woman, (Doc. No. 14 at 8), alleges that Devoted Health "engaged in unlawful employment practices when they discriminated or permitted their supervisory employees to discriminate against Plaintiff in connect with the compensation, terms,

13

conditions, and privileges of employment on account of her race or national origin." (Doc. No. 1 at 4). Title VII of the Civil Rights Act of 1964 ("Title VII") provides that "it shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

When a plaintiff does not allege direct evidence of discrimination, which is the case here, courts apply the *McDonnell Douglas* burden-shifting framework. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish a *prima facie* claim for race discrimination under Title VII, a plaintiff must show that she (1) is a member of a protected group; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) she was replaced by someone outside her protected group or she was treated less favorably than other similarly situated employees outside the protected group. *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021). If the plaintiff establishes a *prima facie* claim, the burden shifts to the employer to offer a non-discriminatory reason for the adverse action. *Id.* If the employer offers such a reason, the burden shifts back to the plaintiff to show that the employer's provided reason is pretext for a discriminatory purpose. *Id.*

Devoted Health argues that Byrd has failed to state a *prima facie* claim for discrimination on the basis of race or national origin because she has failed to demonstrate that she was replaced by someone outside her protected group or that she was treated less favorably than other similarly situated employees outside the protected group. *Ernst*, 1 F.4th at 339. The "similarly situated" prong requires a plaintiff to show that she "was treated less favorably than other 'under nearly identical circumstances.'" *Morris v. Town of Indep.*, 827 F.3d 396, 401 (5th Cir. 2016). As a result,

14

the practical effect is that "comparators must share the same job or responsibilities, the same supervisor, the same conduct leading to the adverse decisions, and essentially comparable violation histories." *Ray v. United Parcel Serv.*, 587 Fed. App'x 182, 194 (5th Cir. 2014). If a plaintiff cannot meet their burden in establishing a *prima facie* case of discrimination, the Court need not reach the subsequent burden-shifting analysis under *McDonnell Douglas. Sanders v. Regions Bank*, No. 4:22-CV-1523, 2024 WL 2159961, at *4 (S.D. Tex. May 14, 2024).

Byrd argues that "[o]ther employees with worse performance than [her] were not disciplined" and provides what appears to be a screenshot of a chart as support. (Doc. No. 14 at 8). This "chart" is unauthenticated by any sworn testimony and appears to be an excel sheet with metrics for twelve employees, including Byrd, from February 20, 2024, to February 23, 2024. (Doc. No. 14-2 at 1). The metrics include outreach attempts, "Appts (Intl & Rs)," conversion rate, connection rate, and call gap average. (*Id.*). While Byrd argues that this chart establishes a genuine dispute of material fact that she was treated less favorably than employees outside the protected class, Byrd offers no evidence to explain the meaning of this data or establish how this data was collected, nor does she provide any evidence that these employees were outside the protected class and/or were treated any more favorably. Byrd simply provided an unauthenticated document with the names of unknown people associated with unknown numbers. As the Fifth Circuit has repeatedly advised, "[w]hen a plaintiff gives only a conclusory explanation about why an individual is an appropriate comparator, the plaintiff's discrimination claim fails." *Shahrashoob v. Texas A&M Univ.*, 125 F.4th 641, 652 (5th Cir. 2025) (emphasizing "what the record doesn't reflect," including the job title, responsibilities, supervisor information, or other attributes to establish that the comparator was similarly situated). In this case, the record does not reflect any information required to establish these eleven people as comparators and the single vague chart is

15

insufficient to support a *prima facie* claim for discrimination on the basis of race or national origin under Title VII.

## B. Disability Discrimination

Second, Byrd alleges that Devoted Health unlawfully discriminated against her on the basis of her disability. The ADA prohibits an employer from discriminating against a "qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). When there is no direct evidence of disability discrimination, the Court analyzes a disability discrimination claim under the *McDonnell Douglas* framework as outlined above. *Bennett v. Dallas Indep. Sch. Dist.*, 936 F. Supp. 2d 767, 776 (N.D. Tex. 2013). Under *McDonnell Douglas*, plaintiffs must first establish a *prima facie* case of discrimination. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671 (5th Cir. 2004). If the plaintiff does, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for its actions. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). The burden then shifts back to the plaintiff to prove that the employer's explanation was a pretext for discrimination. *Id.* at 694, 702.

## 1. Byrd has established a *prima facie* case of discrimination.

The Court finds that Byrd has established a *prima facie* case of disability discrimination. "To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that [s]he has a disability, (2) that [s]he was qualified for the job, and (3) that [s]he was subject to an adverse employment decision on account of [her] disability." *LHC Grp., Inc.*, 773 F.3d at 697.

As to the first element, Byrd provided summary judgment evidence from her medical professionals that she has a documented history with anxiety, depression, PTSD, and post-surgery complications that cause frequent bathroom use. *See* (Doc. No. 14-2 at 24) (describing her experience with abdominal discomfort, heartburn, difficulty with certain foods); (Doc. No. 14-2 at

16

30) (describing her mental health history). Under the ADA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C.A. § 12102(3). Byrd presented evidence that after returning from FMLA leave due to her abdominal surgery, she returned with mental and physical trauma, including increased anxiety, depression, PTSD, and frequent trips to the bathroom that limited her abilities to eat and work. Accordingly, the Court finds that there is a genuine dispute of material fact as to whether Byrd has a disability under the ADA.

As to the second element, Devoted Health does not dispute that Byrd was qualified for her position as a Member Outreach Specialist. Even so, Byrd provided summary judgment evidence that in her two previous annual reviews, Devoted Health noted that she had met and sometimes exceeded expectations and presented several specific examples of her competency in the role. *See* (Doc. No. 14-1 at 1–8). The Court finds that this evidence creates a genuine dispute of material fact that Byrd was qualified for her position.

Lastly, Byrd contends that she was terminated from the position on account of her disability. In support of her position, Byrd directs the Court to Pierce's accusations that she was "stealing time" by frequently using the bathroom on the clock and that in order to use the bathroom more often than the two allotted 15-minute periods per day, Byrd would need an official disability accommodation. *See, e.g.*, (Doc. No. 12-2 at 21–23). Byrd argues that these accusations were also included in her Final Warning. (Doc. No. 12-7) (Final Warning) ("[T]he supervisor explained that

17

being clocked in but not completing work is considered time theft."). Byrd further directs the Court to the temporal proximity between the dispute with Pierce related to her bathroom breaks on February 27, 2024, (Doc. No. 12-2 at 21–23), her application for an accommodation to take additional breaks on February 29, 2024, (Doc. No. 14-2 at 38–43), and her termination on March 11, 2024. (Doc. No. 14-2 at 59). Recognizing that the burden on plaintiffs at the *prima facie* stage is "not onerous," *Ramirez v. PHI Health, LLC*, 762 F.Supp.3d 596, 611 (S.D. Tex. 2025) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015)), the Court finds that Byrd has established a *prima facie* case for disability discrimination.

## 2. Devoted Health articulated a legitimate, nondiscriminatory reason for termination.

Having found that Byrd has established a *prima facie* case for disability discrimination, the burden shifts to Devoted Health to articulate a legitimate, nondiscriminatory reason for the termination of her employment. *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 484 (5th Cir. 2023). The Fifth Circuit has recognized that "[t]erminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law." *Ramirez*, 762 F.Supp.3d at 611 (quoting *LHC Grp.*, 773 F.3d at 701–02). Furthermore, the Fifth Circuit has "repeatedly recognized that poor job performance is a legitimate, nondiscriminatory reason for firing an employee." *Id.* (quoting *Benjamin v. Felder Servs., LLC*, 753 Fed. App'x 298, 302 (5th Cir. 2018)).

Devoted Health produced evidence that when Byrd returned from FMLA leave, her work performance declined. After she received a two-day training course on the new programs, Byrd continued to make scheduling mistakes and had to frequently meet with her supervisors. (Doc. No. 12-2 at 14–15); (Doc. No. 12-4 at 20). Devoted Health presented evidence that even after those meetings, Byrd failed to complete assignments, (Doc. No. 12-4 at 20), rescheduled or failed to

18

attend one-on-one training sessions, (*id.* at 16–18), and spent significant amounts of "no outreach" time in the morning, (*id.* at 18–20). These concerns were memorialized in the Final Warning presented to Byrd, which stated that Byrd failed to complete assigned tasks, failed to prevent call avoidance, failed to demonstrate accountability and ownership, failed to demonstrate organizational skills, and misrepresented working hours. (Doc. No. 12-7). Devoted Health also presented evidence that after the Final Warning was issued, Byrd continued to schedule appointments incorrectly, (Doc. No. 12-4 at 8–9, 15), declined meetings, (*id.* at 9), and failed to follow protocols on her calls with the members. *See* (*id.* at 5–6) (Doc. No. 12-8) (audio recording).

Devoted Health relies on the audio recording of one phone call made after Byrd received her Final Warning to demonstrate the deterioration of her work performance. (Doc. No. 12-8). On the phone call, Byrd spent nearly seven minutes attempting to schedule an appointment for the member. (*Id.* at 6:27). In her attempt to schedule the appointment, Byrd seemed disorganized and inefficient, leaving long moments of silence between her and the member as she was "looking" for an open available spot. (*Id.*). Just as the appointment was to be confirmed, the audio captured a cell phone ringing in the background and Byrd stated, "hold on one second, hold on one second" and placed the member on hold. (*Id.*). After waiting nearly fifteen minutes on hold without any communication from Byrd, the member ended the call. (*Id.* at 21:02).

The Court finds that the evidence produced by Devoted Health articulates legitimate, nondiscriminatory reasons for the termination of Byrd's employment. *See LHC Grp.*, 773 F.3d at 701–02.

### 3. There is no genuine dispute of material fact that the legitimate, nondiscriminatory reasons were pretext for disability discrimination.

Having determined that Devoted Health articulated legitimate, nondiscriminatory reasons for the termination, the burden shifts back to Byrd to show that Devoted Health's reasons were a

pretext for disability discrimination. *Id.* at 702. To satisfy this burden, Byrd "must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016). "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence."'" *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578. "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Wallace v. Seton Fam. of Hosps.*, 777 Fed. App'x 83, 89 (5th Cir. 2019).

Byrd argues that the reasons addressed in the Final Warning were pretext for disability discrimination because (1) her metrics exceeded those of non-disabled employees who were retained, (2) all discipline occurred within days of disclosing disability and requesting accommodation, (3) the lack of progressive discipline, and (4) her history of positive reviews.[3] The Court finds that, on balance, this evidence does not create a genuine dispute of material fact that the alleged reasons for the termination were pretext for disability discrimination.

As a preliminary matter, the Court does not consider the metrics of other employees as sufficient evidence of pretext. While evidence of disparate treatment can be proven with comparator evidence, such evidence must be sufficiently explained to demonstrate that Byrd was treated differently, and worse, than non-disabled employees. *See Mueck*, 75 F.4th 469.

---

[3] Byrd also states that "Ms. Pierce's Admission of Animus" is evidence of pretext. (Doc. No. 14 at 8). Nevertheless, the document cited as support for the assertion that Pierce was allegedly "[b]ragging about 'winning' regardless of being 'wrong'" was not included in the summary judgment record. (*Id.*). Accordingly, the Court cannot consider this argument.

20

Nevertheless, as explained above, the single chart provided by Byrd to support this argument is a vague, unauthenticated, and unexplained list of people with associated data. The Court finds that this "evidence" is insufficient to show pretext.

The Court next addresses the issue of temporal proximity. Byrd argues that the temporal proximity between the disclosure of her disability, her request for accommodation, and her termination are evidence of pretext. The Fifth Circuit has recognized that "a plaintiff can show pretext through temporal proximity plus *significant* record evidence." *Shahrashoob*, 125 F.4th at 641. "Although '[t]iming standing alone is not sufficient absent other evidence of pretext,' the 'combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.'" *Davis v. Indep. Contract Drilling, Inc.*, No. 4:16-CV-00252, 2019 WL 12000808, at *9 (S.D. Tex. Mar. 14, 2019) (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015)). In this case, the relevant timeline is as follows:

- **February 27, 2024:** Byrd attempted to reschedule a meeting because she was in the bathroom and that she required additional bathroom breaks due to her recent abdominal surgery. (Doc. No. 12-4 at 16). Pierce informed Byrd that she needed to contact Human Resources and request an official accommodation for additional bathroom breaks. (Doc. No. 12-4 at 18); (Doc. No. 12-2 at 23).

- **February 27, 2024:** Byrd contacted Human Resources and reported that due to her recent surgery, she needed to use the bathroom more frequently in the mornings. (Doc. No. 12-6). Human Resources directed Byrd to submit an accommodation request through the third-party agency, SunLife, if she needed more bathroom breaks. (*Id.*).

- **February 29, 2024:** While it is unclear as to which occurred first, Byrd submitted an application for accommodation to use the bathroom more frequently at 10:16 AM, *see* (Doc. No. 14-2 at 43) (showing the timestamp for the signature), and Devoted Health issued the Final Warning to Byrd at some point that day. (Doc. No. 12-7).

- **March 8, 2024:** SunLife sent a letter to Byrd to request more information about her accommodation request. (Doc. No. 12-8).

- **March 11, 2024:** Devoted Health terminated Byrd's employment. (Doc. No. 14-2 at 59).

The timeline indicates that the Final Warning came only two days after Byrd revealed her need for an accommodation and two days after she was directed by Pierce and Human Resources to seek an official accommodation. Moreover, the actual termination occurred only three days after SunLife began the interactive process and less than two weeks after Byrd first revealed her accommodation to Devoted Health. The Court finds that this temporal proximity is evidence that the reasons listed in the Final Warning were pretext for disability discrimination. Nevertheless, as temporal proximity alone cannot establish pretext, the Court reviews Byrd's other material.

Byrd also argues that the lack of progressive discipline shows that the Final Warning was pretext for discrimination. Based on the record before the Court, Byrd never received any disciplinary action or other formal notice that her work was inadequate before she received the Final Warning less than two weeks before her termination. (Doc. No. 12-7). After Byrd joined the new team after her FMLA leave, she received two days of training and was explicitly told by the software trainers at Devoted Health that mistakes were to be expected with the new system. (Doc. No. 12-2 at 11–12) ("We were told not to worry about it and they kept emphasizing the don't – oh, this is new for you-all, don't worry. They just kept saying if you have any questions, just reach out in the Chat."). Nevertheless, Byrd received the Final Warning on February 29, 2024, in part, for her scheduling errors on the new software. (Doc. No. 12-7).

While those facts may be true, the lack of progressive discipline is only relevant to the pretext inquiry if the plaintiff can show that Devoted Health failed to follow its own progressive discipline policy. *See, e.g., Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 390 (5th Cir. 2020) ("Termination of an employee that does not proceed pursuant to an employer's progressive discipline may give rise to an inference of pretext."). Byrd did not supply any evidence that

22

Devoted Health maintained a formal disciplinary policy, and even if it did, Byrd provided no evidence that Devoted Health did not follow that policy. Even assuming that Devoted Health did not follow its progressive discipline policy, the Court notes that Pierce made several attempts to correct Byrd's performance errors. Pierce scheduled one-on-one meetings and shadowing sessions with Byrd to review her scheduling errors, (Doc. No. 12-2 at 14); (Doc. No. 12-4 at 16), held team meeting to discuss call avoidance practices, (Doc. No. 12-7), issued the Final Warning with specific action items, (*id.*), and sent messages with reminders about scheduling practices and other work policies, (Doc. No. 12-4 at 9). The Court finds that the lack of evidence to support a claim that Devoted Health failed to follow its own progressive discipline policy (or even had such policy in place), as well as the undisputed record that Devoted Health made repeated attempts to work with Byrd to correct the performance-related errors, fail to establish evidence of pretext.

Lastly, Byrd contends that her two prior Annual Performance Reviews in 2022 and 2023, as well as her awards in November and December of 2023, create a genuine dispute of material fact that the performance-related reasons outlined in the Final Warning were pretext for discrimination. Byrd is correct that in both 2022 and 2023, her supervisors observed that she met or sometimes exceeded expectations. (Doc. No. 14-1). In 2022, her supervisor wrote that Byrd "asks great questions in order to better understand processes." (*Id.*). In 2023, her previous supervisor (before she went out on FMLA leave) wrote that Byrd "excelled in listening to members and asking questions" and complimented her "ability to simplify complex problems," "adapt to work flow changes," and "use[] her prior experience to guide her actions and assist members." (*Id.*). Byrd received her 2023 Annual Performance Review on March 7, 2024—just four days before her termination. (*Id.* at 6). Byrd also provided evidence that she was recognized on a few occasions for completing the most calls on her team in a one-week period. *See* (Doc. No. 14-2 at

23

5–10). Byrd argues that the content of these positive reviews, and the temporal proximity between her 2023 review and her termination, are evidence of pretext.

Complicating her position, however, is that these performance reviews did not cover the relevant time period of her employment or any of her work on the new team. Devoted Health does not claim that Byrd was failing to meet expectations in 2022 or 2023. Devoted Health maintains that these performance-related issues arose when Byrd returned from FMLA leave and joined a new team. While Byrd received the positive 2023 Annual Performance Review in March 2024, the review was prepared by her *previous* supervisor on her *previous* team for the time period between January 1, 2023 and December 31, 2023. (*Id.* at 5). While the Review listed Pierce as her manager, the Review started that she was *evaluated* by her previous supervisor, Eric Lowery. (*Id.*). There is no evidence that Pierce wrote, reviewed, or approved the Review. Accordingly, the 2023 Annual Performance Review did not address any work performed in 2024 or any of the repeated errors in her work noted by Pierce. While the Court can consider evidence of positive performance evaluations to support a finding of pretext, the Court notes that all of the concerns regarding Byrd's work performance listed in the Final Warning occurred two to three months after the time period for which she received the positive review.

Even assuming, *arguendo*, that the Court considers the previous positive reviews as evidence of pretext, the Court finds that the combination of the reviews and the temporal proximity does not rise to the level of "substantial evidence" that "is of such a quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Wallace*, 777 Fed. App'x at 89. Without substantial evidence of pretext, there is no genuine dispute of material fact that Devoted Health discriminated against Byrd on the basis of her disability. This claim is dismissed with prejudice.

## C. Retaliation

Byrd also brought a retaliation claim against Devoted Health. While the Complaint is certainly not a "model of clarity," the Court interprets this claim (along with the arguments in the summary judgment briefing) as an ADA retaliation claim. *See Harvey v. Montiel*, No. 25-40127, 2026 WL 483286, at *1 (5th Cir. Feb. 20, 2026). The ADA prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020) (quoting 42 U.S.C. § 12203(a)). "When a plaintiff presents indirect evidence of unlawful retaliation under the ADA, we apply the burden-shifting scheme established in *McDonnell Douglas*." *Id.* To establish a *prima facie* case of unlawful retaliation under the ADA, the plaintiff must show that: (1) she engaged in an activity protected by the ADA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Id.*

The Court finds the analysis to be nearly identical to the discussion above with one exception. In order to establish a *prima facie* case of retaliation, the plaintiff must show that the decisionmakers had knowledge of the protected activity. *Tureaud v. Grambling State Univ.*, 294 Fed. App'x 909, 914 (5th Cir. 2008) ("To establish a 'causal link' because the protected activity and the adverse employment decision, the evidence must demonstrate that the decision maker had knowledge of the protected activity."). In this case, Byrd must show that the actual decisionmakers at Devoted Health had knowledge that she requested the accommodation through SunLife. While Human Resources and Pierce both directed Byrd to apply for a formal accommodation, there is no evidence on the record that indicates that either Pierce or the other individuals involved in the

25

termination had actual knowledge that Byrd submitted an application to SunLife. *Cf. Leggio v. Ochsner Clinic Found.*, 2023 WL 2955310, at *13 (E.D.L.A. Apr. 14, 2023) (describing summary judgment evidence that SunLife emailed the defendant company that the plaintiff had requested an accommodation). Byrd has not provided any evidence that SunLife communicated with Devoted Health about her accommodation request or that Pierce and/or Human Resources otherwise had knowledge that she actually submitted the request.

Even assuming, *arguendo*, that Byrd has established a *prima facie* case of retaliation, which this Court does not, Byrd falls short at the pretext stage of this inquiry. As discussed above, even though the temporal proximity between the disclosure of her disability, her request for accommodation, and her termination does present some evidence of pretext, the temporal proximity does not rise to the level of "substantial evidence" that "is of such a quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Wallace*, 777 Fed. App'x at 89; *Lyons*, 964 F.3d at 307 ("This 'very close' temporal proximity is sufficient to establish the 'causal connection' element of her prima facie case, but it is insufficient to demonstrate pretext.'"). Without substantial evidence of pretext, there is no genuine dispute of material fact that Devoted Health retaliated against Byrd for her participation in protected activities. This claim is dismissed with prejudice.

**D. Failure to Accommodate**

As the Court earlier noted, the Complaint is certainly not the "model of clarity." *See Harvey*, 2026 WL 483286, at *1. Devoted Health has asked the Court to dismiss the "failure to accommodate" claim. Byrd responded in opposition. While the Complaint only lists "discrimination on the bases of race, nationality, retaliation, and hostile environment," "discrimination on the basis of disability," and "intentional infliction of emotional distress," as the

causes of action, the Court acknowledges that Byrd alleges that "she requested accommodation but was denied." (Doc. No. 1 at 4). To the extent that Byrd pleaded a failure to accommodate claim under the ADA, the Court grants the Motion for Summary Judgment and dismisses the claim with prejudice.

To prevail on a failure to accommodate claim, a plaintiff must prove that (1) she was a qualified individual with a disability; (2) that the disability and its consequential limitations were known to the defendant; and (3) the defendant failed to make reasonable accommodations for those known limitations. *See Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323-24 (5th Cir. 2021). When a disability is known and "an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Harmon v. Collier*, 158 F.4th 595, 611 (5th Cir. 2025). "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Id.* (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)).

In this case, Byrd contends that "[t]erminating an employee to avoid providing accommodation is the ultimate failure to accommodate." (Doc. No. 14 at 15). While, in theory, that may be the case, Byrd has failed to present enough evidence to create a genuine dispute of material fact that the goal of the termination was to avoid the accommodation. Byrd relies on the same arguments that she set out in support of her disability discrimination claim. While there was significant temporal proximity between her application for accommodation and her termination, there is no evidence that suggests the termination was to prevent Byrd from taking additional

27

breaks at work. Indeed, the evidence demonstrates that Devoted Health encouraged Byrd to formally seek an accommodation.

Additionally, there is no evidence that Devoted Health's unwillingness to engage in the interactive process resulted in the termination. On February 29, 2024, Byrd submitted a bare-boned application for an accommodation to SunLife. (Doc. No. 14-2 at 38–43). She did not provide any medical documentation or any specific information related to her disability other than she may "need to go to the bathroom at random." (*Id.*). On March 8, 2024, SunLife responded with a request for further information. (Doc. No. 12-8). Byrd did not respond to the inquiry before she was terminated, and while that temporal proximity may suggest pretext, the temporal proximity does not create a genuine dispute of material fact that the goal of the termination was to avoid accommodation.

This conclusion is furthered by the substantial evidence presented by Devoted Health that Byrd was consistently missing the mark in her work performance. As discussed above, Byrd had been consistently reminded and warned by Pierce that the scheduling errors, call avoidance behaviors, failure to attend required meetings, and significant "no outreach" time were problematic. Devoted Health also presented an audio recording of a call during which Byrd left a member on hold for over fifteen minutes for no apparent reason. (Doc. No. 12-8). The Court finds that, on balance, there is no genuine dispute of material fact that the termination was not an attempt to escape the interactive process. Accordingly, the Court dismisses this claim with prejudice.

### E. Hostile Work Environment

The Court next addresses Byrd's hostile work environment claim against Devoted Health. Byrd alleges that Devoted Health fostered a hostile work environment connected to her disability and other protected activity. To state a hostile work environment claim, "the plaintiff must show

28

that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action." *EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Byrd must make a sufficient showing that a genuine issue of fact exists, or conclusively establish, all five elements. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 404 (5th Cir. 2021).

While the Court has concluded that Byrd is a member of a protected group, the Court finds that Byrd has failed to create a genuine dispute of material fact for any other element of the hostile work environment claim. Byrd argues that through "death imagery" memes, harassment, "mockery of medical conditions," and "forcing interactions during medical episodes," Devoted Health created a workplace that was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009). Nevertheless, "[w]orkplace conduct 'is not measured in isolation,'" and the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

As a preliminary matter, the Court has already discussed, at length, the allegations that Pierce mocked her medical condition or forced her to interact during medical episodes. In large part, this boils down to the single interaction when Byrd attempted to reschedule the shadowing session due to her need to use the bathroom and Pierce accused her of "stealing time." Byrd argues

29

that this contributed to a hostile work environment. Nevertheless, as the Court has discussed, this interaction stemmed from a scheduled meeting that Byrd attempted to unilaterally reschedule without explanation. After Byrd provided explanation, the interaction ended and both Pierce and Byrd reached out to Human Resources. Based on the record before the Court, while there is evidence that Pierce said that Byrd was "stealing time" by not working while she was on-the-clock, there is no evidence that Pierce made any offensive remarks about her disability or other protected status. "This is not the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace." *Stewart*, 586 F.3d at 330. This type of one-on-one animosity or conflict cannot support a hostile work environment claim. *Kidd v. City of Houston*, 2019 WL 6913317, at *7 (S.D. Tex. Feb. 7, 2019) ("An acrimonious relationship with a supervisor, in the absence of any evidence of unlawful discrimination, does not give rise to a claim under Title VII."). *Offord v. City of Fulshear*, No. H-19-2386, 2020 WL 4227423, at *2 (S.D. Tex. July 22, 2020) ("Ordinary co-worker friction and inconveniences at work, although unpleasant, do not equate to hostility."); *Schumacher v. City of Round Rock, Tex.*, No. 1:18-CV-334, 2019 WL 13275424, at *4 (W.D. Tex. Jan. 17, 2019) ("Isolated incidents, unless extremely serious, do not rise to the level of creating a hostile work environment.").

Byrd also argues that after she disclosed her sister-in-law's cancer and her own medical conditions, Pierce "posted disparaging remarks and obscene cartoon images about death in the team slack channel." (Doc. No. 14 at 12). She argues that "[f]or someone dealing with medical issues and family cancer, death imagery is particularly threatening and severe." (*Id.*). Nevertheless, the Court finds that the "cartoon images" in question are hardly "death depicting." (Doc. No. 14-2 at 35). While there was no context shared to these conversations, the screenshot shows that one

30

employee posted a photo with the caption "rising from the grave." (*Id.*). The post received several

laughing and prayer-emoji reactions.



(*Id.*). Byrd also provided a photo posted by Pierce with the caption: "Me 1 – Grim Reaper – 0!"



(*Id.*). Byrd does not provide the context for these photos, and she did not provide any evidence

about the recipients of these photos, the conversation surrounding these photos, or whether these

31

photos were directed towards her or pertained to her at all. When Byrd was asked in her deposition whether she believed these memes were posted due to her race, national origin, or disability, or even directed towards her personally, she testified: "I don't know." (Doc. No. 12-2 at 30).

Finding no evidence on the record to show that these photos were directed at Byrd or pertained to Byrd at all and finding no evidence to explain the context of these photos, the Court finds that these posts are not "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, [or] one that the victim did perceive to be so" or "the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace," as required to establish a hostile work environment claim. *Hernandez*, 670 F.3d at 651; *Stewart*, 586 F.3d at 330.

Having determined that the conduct described by Byrd does not rise to the level of a hostile work environment, the Court dismisses this claim with prejudice.

### F. Intentional Infliction of Emotional Distress

Lastly, the Court addresses Byrd's intentional infliction of emotional distress claim. In her Complaint, Byrd alleges that "Defendant intentionally or recklessly, through its employee, inflicted emotional distress on the Plaintiff when it terminated the Plaintiff's job after the Plaintiff requested accommodation due to her mental disability." (Doc. No. 1 at 5). It is well-settled that intentional infliction of emotional distress is "a gap-filler tort," judicially created to allow recovery in the rare case where a defendant intentionally inflicts severe emotional distress in such an unusual manner that no other theory of recovery is available to the victim. *Hoffmann–La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). The tort was created "to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied." *Id.* An intentional infliction of emotional distress claim is not available, however,

32

where the underlying conduct is covered by another statutory scheme. "If the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim regardless of whether he or she succeeds on, or even makes, a statutory claim." *Hoffmann–La Roche,* 144 S.W.3d at 448. The availability of other remedies—even if they do not explicitly preempt the tort—"leaves no gap to fill." *Creditwatch v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005).

In this case, the Complaint clearly bases the intentional infliction of emotional distress claim on the same factual allegations that underpin her discrimination and retaliation claims. "The complaint does not allege any conduct to support her intentional infliction of emotional distress claim that differs from that underlying her state and federal discrimination claims." *Mcnamee v. Cellular Sales of Tex.,* No. 4:13-CV-741, 2014 WL 97390, at *3 (N.D. Tex. Jan. 9, 2014). Accordingly, her remedies are limited to those under the ADA and Title VII, and this claim is dismissed with prejudice.

### IV.    Conclusion

For the foregoing reasons, the Court hereby grants Devoted Health's Motion for Summary Judgment on each of the causes of action. The Court dismisses this civil action with prejudice and will enter a separate judgment compliant with Federal Rule of Civil Procedure 58(a).

It is so ordered.

Signed on this the ___8___ day of May 2026.

Andrew S. Hanen
United States District Judge